# CIRCUIT COURT OF THE CITY OF RICHMOND

Mirant Potomac River, L.L.C.

    v.

State Air Pollution Control Board

July 30, 2008

Case No. CL07-5702

BY JUDGE T. J. MARKOW

The parties came on the Petition for Appeal, and argument was heard.
This is a case in which Petitioner, Mirant Potomac River, L.L.C., ("Mirant") the owner of a coal-fired power plant located in Alexandria, challenges the adoption of a regulation by the State Air Pollution Board ("Board") on October 10, 2007, concerning the nonattainment area requirements of the Clean Air Interstate Rule ("Interstate Rule"). The regulation prevents existing pollutant emitters located in nonattainment areas from participating in the emissions cap-and-trade program authorized by regulations adopted by the U.S. Environmental Protection Agency ("EPA"). The regulations were adopted pursuant to Virginia Code § 10.1-1328.

Mirant owns several power plants in the District of Columbia metro area, a nonattainment area for the National Ambient Air Quality Standards ("National Standards"). The Mirant Potomac River Generating Station ("Potomac Plant"), a coal-fired power plant in Alexandria, is the only facility located in Virginia which would be affected by the regulation. Mirant has reduced emissions at its Maryland facilities below required standards, thereby earning credits which it proposes to allocate to the Potomac Plant in Virginia.

The October 10, 2007, regulation prevents Mirant from doing so by creating plant-specific emissions caps and prohibiting the trade of allowances amongst commonly owned facilities.

Here, Petitioner bases its appeal on the following assignments of error: the Board's regulation (1) is contrary to statutory authority, not based on substantial evidence, and unconstitutional; and (2) deprives Mirant of its right to equal protection of law under the Virginia and United States Constitutions. Other grounds were cited in the Petition for Appeal, but were not argued and will not be addressed here.

Mirant argues that the Board failed to consider relevant information including economic factors, technical information, modeling data, economic impact information, and public comments when promulgating the regulations. As such, the Board failed to make the necessary findings to justify the trading restriction.

Mirant also claims that the Board acted *ultra vires*, beyond the scope of any applicable Virginia statute, by interpreting the meaning of the word "purchase" as used in Virginia Code § 10.1-1328(A)(5) to include all forms of exchange between private entities.

As the owner of the only facility burdened by the regulation under consideration, Mirant claims that the Board has singled it out for unconstitutional disparate treatment, based in part on personal animus of Board members toward it and who defer to the wishes of the City Council of Alexandria.

Further, Mirant argues that the regulation prevents existing emission sources from participating in the emissions trading program, divorcing them from the economic incentive of the cap-and-trade program while giving their competitors an unfair advantage.

Finally, Mirant argues that the Board's decision was both arbitrary and capricious, unsupported by the evidence, and will lead to diminution in plant productivity that will inevitably result in plant closure which Mirant argues constitutes an unconstitutional taking of its property.

Mirant filed its Petition for Appeal seeking judicial review of the regulations pursuant to the State Air Pollution Control Law, Va. Code § 10.1-1317, the Virginia Administrative Process Act, Va. Code § 2.2-4026, and Rule 2A:4 of the Rules of the Supreme Court of Virginia.

The Federal Clean Air Act requires individual states to develop a State Implementation Plan to reach the National Standards for six separate air pollutants including sulfur dioxide, nitrogen oxides, ozone, and particulate matter. In 2004, the EPA found that 28 states, including Virginia, were contributing to National Standards violations in other states.

When the State Implementation Plans failed to control regional, interstate pollution, the EPA enacted the Interstate Rule on July 11, 2005, to create emissions budgets for the offending states. Under the Interstate Rule, the total amount of allowable emissions is determined and then a portion is allotted to each pollutant emitter. The pollutant emitters may form an exchange market wherein they trade their emissions allowances between themselves. Those emitters that have reduced their emissions are permitted to sell and trade their allowance overages to those who will emit more pollutants than their allotted amount.

The Interstate Rule allowed states the "flexibility to achieve emissions reductions however they chose, including developing and implementing their own trading program." 70 Fed. Reg. 25162, 25274 (May 12, 2005). Alternately the Interstate Rule allows states "to participate in an EPA-managed cap-and-trade program. To participate, a State must adopt the model cap-and-trade rules finalized in this section of today's rule with flexibility to modify sections regarding nitrogen oxide allocations and [to determine] whether to include individual unit opt-in provisions." 70 Fed. Reg. 25162, 25274 (May 12, 2005).

Virginia Code § 10.1-1322.3 permits the Board to promulgate regulations "to provide for emissions trading programs to achieve and maintain the National Ambient Air Quality Standards established by the United States Environmental Protection Agency, under the Clean Air Act." Va. Code § 10.1-1322.3. It provides:

> The regulations shall create an air emissions banking and trading program for the Commonwealth, to the extent not prohibited by federal law, that results in net air emission reductions, creates an economic incentive for reducing air emissions, and allows for continued economic growth through a program of banking and trading credits or allowances.

Virginia Code § 10.1-1322.3 lists factors the Board shall consider when promulgating the regulations and provides, "No regulations shall prohibit the direct trading of air emissions credits or allowances between private industries, provided such trades do not adversely impact air quality in Virginia." Virginia Code § 10.1-1322.3. ·

The Virginia General Assembly enacted Virginia Code § 10.1-1328 "[t]o ensure that the Commonwealth meets the emissions budgets established by the federal Environmental Protection Agency (EPA) in its CAIR [Interstate Rule]." Va. Code § 10.1-1328. Virginia Code § 10.1-1328 requires the State

Air Pollution Control Board ("Board") to promulgate regulations allocating specified annual amounts of nitrogen oxide, sulfur dioxide, and mercury to electric generating units within the Commonwealth. Virginia Code § 10.1-1328(A)(5) provides:

> The regulation shall provide for participation in the EPA-administered cap and trade system for NOx [nitrogen oxide] and SO2 [sulfur dioxide] to the fullest extent permitted by federal law except that the Board may prohibit electric generating facilities located within a nonattainment area in the Commonwealth from meeting the NOx and SO2 compliance obligations through the purchase of allowances from in-state or out-of-state facilities.

Va. Code § 10.1-1328(A)(5)).

Virginia Code § 10.1-1322.3 requires that the Board consider "the inclusion of provisions concerning" factors not limited to "(i) the definition and use of emissions reduction credits or allowances from mobile and stationary sources, (ii) the role of offsets in emissions trading, (iii) interstate or regional emissions trading, (iv) the mechanisms needed to facilitate emissions trading and banking, and (v) the role of emissions allocations in emissions trading." Va. Code § 10.1-1322.

The record reflects that the Board considered these factors and others throughout the process of drafting, amending, and adopting the regulations. The Board conducted extensive research and multiple public comment periods before amending and adopting the proposed regulations. 24 Va. Reg. 6,678 (Nov. 26, 2007). The regulation that forms the crux of Mirant's appeal directly concerns "the role of emissions allocations" and their application to "interstate or regional trading."

Mirant contends that the Board singled out Mirant and the Potomac Plant in order to strip the plant of its economic viability and to force its closure. Although the Potomac Plant is the only facility currently located in a nonattainment area and currently the only facility affected by the statute, the Court can find no evidence that either the statute or the regulations were created to single-out, harass, or cause injury to the Potomac Plant or to Mirant. The Court also finds no evidence that the regulation was promulgated to stymie Mirant's ability to compete with other electricity providers. The regulation applies to all similarly situated facilities in nonattainment areas from the time of its enactment and into the future. The purpose of the regulation is not to single out Mirant for harm.

Mirant argues that the regulation is unconstitutional in that its Virginia plant is the only one in the state that is affected by the regulation and that the regulation constitutes an unconstitutional taking of its property. Both arguments are incorrect.

The Board's regulations apply to any plant in a nonattainment area anywhere in Virginia. Currently, the Potomac Plant is the only affected plant, but regulations, like statutes, are written for the future. The Court does not find Mirant's status as a basis to determine the regulation is unconstitutional on an equal protection basis.

Regarding Mirant's argument that the regulation constitutes an unlawful taking of its property, the argument is based upon speculation, i.e. that the plant will become worthless as the result of the regulation. Further, the Board's argument that a taking argument is beyond the reach of this Court's jurisdiction in this appeal under the Administrative Process Act is correct.

Mirant argues that the Board lacked the authority to prevent its Maryland companies from bestowing their allowance overages onto the Potomac Plant. Virginia Code § 10.1-1322.3 provides, "No regulations shall prohibit the direct trading of air emissions credits or allowances between private industries, provided such trades do not adversely impact air quality in Virginia." Virginia Code § 10.1-1322.3. Virginia Code § 10.1-1328(A)(5) permits the Board to "prohibit electric generating facilities located within a nonattainment area in the Commonwealth from meeting the nitrogen oxide and sulfur dioxide compliance obligations through the purchase of allowances from in-state or out-of-state facilities." Va. Code § 10.1-1328(A)(5).

The Court finds that Virginia Code § 10.1-1322.3 allows the Board to promulgate regulations that "prohibit the direct trading of air emissions credits or allowances between private industries" if the trading would "adversely impact air quality in Virginia." The Court finds the substantial evidence in the record to support a finding that trading in this nonattainment area would have an adverse impact on air quality in Virginia.

Mirant finally argues that the Board misinterpreted the term "purchase" in Virginia Code § 10.1-1328(A)(5). Mirant submits that sister facilities owned by the same parent corporation should be allowed to freely swap their allowance overages. Mirant points to language in Virginia Code § 10.1-1328(D)(3) to support the theory that the General Assembly would have included a wider variety of terms if it meant to exclude sister companies from exchanging allowances.

The Court finds, however, that the lack of clarifying language points to an inclusive definition of the term "purchase." Virginia Code § 10.1-1328 includes the word "purchase" in three separate subdivisions, Code § 10.1-

18

1328(A)(5), (D)(3), and (F). The subdivision currently at issue, Virginia Code § 10.1-1328(A)(5) provides "the Board may prohibit electric generating facilities located within a nonattainment area in the Commonwealth from meeting their NOx and SO2 compliance obligations through the purchase of allowances from in-state or out-of-state facilities." The Statute does not qualify the term "purchase."

In contrast, Va. Code § 10.1-1328(D)(3) provides "[t]he owners subject to the state-specific [Clean Air Mercury] rule shall not be permitted to purchase allowances to demonstrate compliance with the regulations the Board adopts to implement this subsection. This prohibition does not include the transfer of credits authorized by subdivision 2." Subdivision (D)(2) allows the transfer of allowances to a facility for compliance purposes where, among other things, the facility from which the allowances are transferred is under common ownership.

Va. Code § 10.1-1328(F) prohibits a facility in a nonattainment area from purchasing allowances to meet its mercury compliance obligation by purchasing allowances from another facility, "except that such facilities shall be able to demonstrate compliance with allowances allocated to another facility that is under the control of the same owner or operator or under common control by the same parent corporation and is located within 200 km of Virginia's border."

The exceptions written into Va. Code § 10.1-1328(D)(3) and (F) specifically permitting the exchange of allowances between sister companies clearly indicate that this type of exchange would otherwise be included within the meaning of "purchase."

The cap-and-trade system is based on economic incentives. Companies implement pollutant-reducing technologies in an effort to use fewer than their budgeted allowances. Companies then bring their "bumper crop" to the market and trade their allowances to companies that have not brought their pollutant levels into compliance. These allowances have a value, and the trade transpiring between the two companies is a sale on the part of the company with an excess of allowances and a purchase on the part of the company with a need for them.

If sister companies are allowed to swap allowance overages free of charge, then there is nothing to prohibit a Maryland company subject to Maryland's statutes and regulations from purchasing allowances from an outside company and giving them free of charge to her sister company in Virginia.

If sister companies are excluded from the purchase restriction and are allowed to freely swap allowances, the economic incentives central to the effectiveness of the cap-and-trade system encouraged by the EPA are ignored and the market becomes artificially distorted.

Mirant's argument, that the regulation exceeds the Board's authority in that Virginia Code § 10.1-1328(A)(5) allows it to prohibit participation in the cap-and-trade program only to the extent that a trade is "purchased" and does not include intra-corporate trades, is incorrect.

Virginia Code § 10.1-1322.3 is superceded by Virginia Code § 10.1-1328(A)(5), as the latter is the more specific of the two statutes. Thus, the Board was not required to make the specific finding required in § 10.1-1322.3, that a trade might be prohibited if it adversely impacted air quality in Virginia.

Other grounds cited in the Petition for Appeal were not argued and are not addressed here.

The Petition for Appeal is dismissed. Mirant's objections are noted.